No. 87,009

STATE OF KANSAS, *Appellee*, v. ALRICK EUGENE PAYNE, SR., *Appellant*.

(44 P.3d 419)

Opinion filed April 19, 2002.

*Michael G. Highland*, of Bonner Springs, argued the cause and was on the brief for appellant.

*Frank E. Kohl*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Alrick Eugene Payne, Sr., from his conviction by a jury of felony murder, aggravated robbery, possession of cocaine, and possession of drug paraphernalia. Payne appeals, contending that the evidence was illegally seized and should have been suppressed, leaving insufficient evidence remaining to convict him.

On Thursday, March 2, 2000, Leavenworth police officers discovered the moderately decomposed body of 65-year-old Eddie Harris in the front room of his residence. Michael Handler, M.D., a forensic pathologist, determined that Harris died from a stab wound to the left side of his neck which severed his carotid artery. Harris had last been seen alive on February 26, 2000, and his neighbors had requested that police check on him. There was no sign of a forced entry into Harris' house, and Harris' vehicle, keys, and wallet were missing. At the scene, police found a bloody knife wrapped in cloth. Police also found calendars with all the days marked off through Saturday, February 26, 2000.

That evening, officers were sent to surveil a vehicle belonging to Harris parked in the 800 block of Dakota Street. Officers were instructed to bring anyone who tried to enter the vehicle to the police station. At 8:50 p.m., Payne got inside the vehicle.

With guns drawn, Officer Joe Tavano pulled Payne out of the car and placed him on his chest in the roadway while another officer handcuffed him. Officer David O'Brien helped Tavano get Payne off the roadway, and Tavano patted Payne down for weapons as soon as they picked him up. Tavano testified he felt what he recognized instantly was a crack cocaine pipe, which he retrieved from Payne's pocket. Tavano testified that he asked Payne whose car it was, and Payne said it belonged to Harris. Payne also stated that he had borrowed the car from Harris "3 days ago." Payne was not told he was being arrested at that time, and none of the officers read him his *Miranda* rights. An arrest warrant had not been issued.

Officer William Slusher testified that when Payne asked why he was being taken into custody, the following discourse took place:

"I told him for a suspicious death, and he was being taken into custody for that. And then I asked him whose car is that and he said Eddie Harris' car. And I asked him how long he had the car and he said for about three days. At that point they were picking him up off the ground when the conversation was going on. And they were leading him away and he like stopped and looked towards me and said, 'So Eddie Harris is dead?' And I told him at that time, 'Well, you need to talk to the detectives about it.' "

None of the officers present had mentioned anything to Payne about Harris being dead.

After transporting Payne to the police station, but before placing Payne in a detention cell, O'Brien again searched Payne, removing a wallet and an Amoco credit card belonging to Harris from Payne's pockets. Inside Payne's shirt pocket O'Brien also removed a small rock of crack cocaine.

Detective Kevin Crim interviewed Payne at approximately 10:30 p.m. on March 2, 2000. Payne told Crim that on the previous Saturday, February 26, or on Sunday, Harris let him use his car. Payne said the last time he saw him, Harris was in the front room of his home watching television. Payne said that Harris gave him the car keys, the registration, and his gas credit card to use for a couple of days.

At 1:19 a.m., on March 3, 2000, Sergeant Dale Warren and Officer Traglio took a second statement from Payne. As Payne was being moved from the holding cell to the county jail, he asked to talk to someone about Harris. Warren took Payne to the interview room, handed him a paper which explained his *Miranda* rights, and read his rights to him. Payne signed a waiver of the right to remain silent and to have a lawyer present.

Warren asked Payne how he had knowledge of Harris' death, and he replied, "Eyewitness." Then Payne stated the name "Browning." Payne spontaneously stated, "After I tell you his name, the rest of the story, then I think I need to talk to the district attorney because I need to make some better deal."

Police later determined that Shawn Browning was connected to Harris' homicide. Browning spoke with police for about 60 minutes, detailing how he had stabbed Harris and that he was the only one who had physical contact with Harris. At Payne's trial, Browning refused to testify, so the trial court ruled that Browning was an unavailable witness. The trial court allowed the State to present the testimony of Crim concerning Browning's statement to police.

In his statement, which was incoherent at times, Browning said another person was present during the murder but would not mention that person's name. Browning told police he contemplated killing Harris for about 2½ years because Harris was gay and had made advances toward Browning. After choking Harris, Browning

reported that he told Payne that Harris "won't go out like I wanted him to." He told Payne to go get him a knife, and Payne did. In addition, Browning indicated that after he killed Harris, he and Payne left in Harris' car and went to Kansas City. Browning told police he took full responsibility for what happened.

Glen Arnold, an employee at Lansing Amoco, testified at the preliminary hearing and at trial that on Wednesday, March 1, 2000, a man identifying himself as Harris came to the Amoco station and used Harris' credit card to purchase gas, snacks, and cigarettes. Arnold said that the man was Payne and indicated that Payne had signed the receipt in Harris' name.

Wilton McCoy, an inmate at the Ellsworth Correctional Facility, testified that he was in the Leavenworth County jail with Payne in March 2000. McCoy said that he was acquainted with Payne, Browning, and Harris. McCoy stated that Payne told him that he, Browning, and Harris were doing drugs together, and Harris had said he would supply more drugs but later refused, which made Payne and Browning angry. Then McCoy related that Browning started to beat Harris, Payne said he joined in, and then they stabbed Harris a couple of times.

Prior to trial, Payne filed motions to suppress the crack cocaine, the cocaine pipe, and the statements Payne made following his arrest to police and to any inmates. The motions to suppress were based on the theory that the officers had exceeded the permissible scope of a *Terry* stop and frisk. See *Terry v. Ohio*, 392 U.S. 1, 18, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

At the suppression hearing, Judge Frederick N. Stewart held that the officer's actions went beyond a *Terry* search and, in fact, constituted an arrest. Further, Judge Stewart found that the arrest was lawful because Payne's possession of Harris' property without any apparent authority constituted probable cause for his arrest. Finally, Judge Stewart denied Payne's motion to suppress based on his finding that "this search was a search incident to a lawful arrest."

Payne was tried before a jury in the District Court of Leavenworth County. Following a 2-day trial, the jury found Payne guilty of (1) murder in the first degree, in violation of K.S.A. 21-3401;

(2) aggravated robbery, in violation of K.S.A. 21-3427; (3) possession of cocaine, in violation of K.S.A. 2001 Supp. 65-4160; and (4) possession of drug paraphernalia, in violation of K.S.A. 2001 Supp. 65-4152.

Payne was sentenced to life imprisonment for the murder charge, with a 59-month consecutive prison sentence for the aggravated robbery. As for the remaining convictions, Payne received concurrent sentences of 11 months' imprisonment for the possession of cocaine and 12 months' jailtime for the possession of drug paraphernalia.

Payne filed a timely appeal to this court from the trial court's denial of his motions to suppress and his motion for a new trial. In addition, Payne appeals the propriety of his conviction and sentence.

## I. SEARCH INCIDENT TO A LAWFUL ARREST AND TO SUPPRESS

The first issue for our review is whether the trial court erred when it found that the search of Payne's person by Leavenworth police officers was a lawful search incident to arrest and, thus, denied Payne's motion to suppress.

"When a motion to suppress evidence is filed, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. *State v. Damm*, 246 Kan. 220, 222, 787 P.2d 1185 (1990) (citing *Mincey v. Arizona*, 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978]). If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, the appellate court must not substitute its view of the evidence for that of the trial court. [Citation omitted.]" *State v. Wonders*, 263 Kan. 582, 588-89, 952 P.2d 1351 (1998).

According to Payne, he was without a doubt "seized," but was not arrested because two of the police officers involved testified they did not believe this was an arrest. Payne contends that since the officers were not armed with a search warrant, since he was not under arrest, and since the officer had no probable cause to believe what he felt in Payne's pocket was a weapon, the act of reaching into his pocket was an intrusive, unwarranted, and illegal search. Payne argues that under *Terry*, officers could permissibly

conduct a brief search for weapons, but could not justify their search and subsequent discovery of the crack pipe.

In addition, Payne asserts that the rock of crack cocaine discovered in his shirt pocket at the police station should also be suppressed as "fruit of the poisonous tree," since it was obtained as a result of finding the crack pipe. Therefore, Payne requests this court to reverse the trial court's decision and remand, with orders to suppress both the crack pipe and the rock of cocaine.

Payne's possession of the car belonging to Harris provided sufficient probable cause for an arrest. The trial court correctly decided that officers discovered the crack pipe and rock of cocaine only after, based on probable cause, they had placed Payne under arrest. The Fourth Amendment to the United States Constitution only prohibits unreasonable searches; thus, the officer's search of Payne was a reasonable search incident to his lawful arrest.

1. Arrest v. detention.

The first matter for our determination is whether the actions of the Leavenworth police officers constituted an arrest or a detention.

K.S.A. 22-2202(4) defines "arrest" as "the taking of a person into custody in order that the person may be forthcoming to answer for the commission of a crime." The United States Supreme Court has equated custody with "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983).

This court has previously stated: " 'Arrest as defined in the Kansas Code of Criminal Procedure contemplates more than the temporary restraint of a person by a law enforcement officer. It is the restraint of a person in order that he or she may be forthcoming to answer for the commission of a crime." *State v. Boone*, 220 Kan. 758, Syl. ¶ 7, 556 P.2d 864 (1976). Moreover, "[a]n arrest is made by an actual restraint of the person arrested . . . ." K.S.A. 22-2405.

Further, in *Alvarado v. City of Dodge City*, 238 Kan. 48, 708 P.2d 174 (1985), this court distinguished a "detention" from an "arrest." " '[D]etention' is defined to mean the *temporary restraint*

of a person by a law enforcement officer. 'Arrest' is defined as the taking of a person into custody *in order that the person may be forthcoming to answer for the commission of a crime."* 238 Kan. at 61.

Here, the Leavenworth police officers did more than temporarily restrain or detain Payne. When Payne entered the vehicle and started the engine, Officer Tavano pulled Payne out of Harris' car and placed him on his chest in the roadway while another officer handcuffed him. Police had their guns drawn and pointed at Payne as he was pulled from the car.

Nothing in the record indicates that officers would allow Payne to proceed to the station for further investigation on his own accord. As one officer noted, "when you are taken out of a car at gunpoint, you are under arrest and you are not free to go." Payne admits that at that point, he was "no longer free to leave." Reviewing the totality of the circumstances, Payne's freedom of movement was restrained to the degree associated with a formal arrest.

Therefore, the trial court was correct in ruling that Payne was arrested, not detained. Payne's assertion that he was not arrested fails.

2. Lawfulness of the arrest.

Next, we must determine whether the arrest was lawful. Here, an arrest warrant had not been issued because law enforcement officials did not know the identity of the person or persons who had taken Harris' car.

"If a warrantless arrest is challenged by a defendant, the burden is on the State to justify the arrest was not only authorized by the statute, but that it was permissible under the Fourth Amendment to the United States Constitution. The constitutional validity of a warrantless arrest depends upon whether the arresting officer had probable cause to believe that the person arrested had committed a felony." *State v. Aikins*, 261 Kan. 346, Syl. ¶ 2, 932 P.2d 408 (1997).

At the suppression hearing and at the hearing on posttrial motions, the trial court found that this was a lawful arrest. Judge Stewart explained his reasoning by stating:

"It appears from the evidence presented at the preliminary hearing and the evidence presented today that Mr. Payne was in possession of a vehicle which was the property of Eddie Harris, who just had been found dead and apparently

murdered, and Mr. Payne was in possession of that property without any apparent authority. The officers had probable cause to arrest him at that point, and based upon the fact that they knew the crime of murder had been committed, and it appeared that there was at least probable cause to believe Mr. Payne was involved in the commission of that offense and at least possession of the stolen property at that point."

The United States Supreme Court has written:

"[T]he judgment of the Nation and Congress has . . . long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like." *United States v. Watson*, 423 U.S. 411, 423-24, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976).

Our court stated in *Aikins*, 261 Kan. 346:

"Probable cause for arrest without a warrant depends upon the probabilities arising from known facts and circumstances. Probable cause exists when the practical considerations of everyday life would lead a reasonable and prudent officer to believe a felony has been or is being committed." Syl. ¶ 3.

"In determining whether probable cause to arrest exists, all the information in the officer's possession, fair inferences therefrom, and facts may be taken into consideration that might not be admissible on the issue of guilt." Syl. ¶ 6.

Here, the Leavenworth police officers were instructed to set up surveillance of Harris' vehicle in connection with the investigation of Harris' murder. Police knew Harris lived alone, had been murdered, and that his car and keys were missing from his residence. Officers were directed to watch the vehicle and to stop anyone trying to operate or enter it and hold him or her in custody for questioning. Officer Slusher watched Payne as he cautiously approached the vehicle, walking away from it once, then turning around "and kind of looking like is anybody watching me . . . ." When officers apprehended Payne he was in Harris' vehicle and had started the engine. Two officers immediately parked their vehicles to the front and rear of Harris' car to prevent Payne from fleeing the scene. Although Payne was not advised that he was under arrest, Officer Slusher testified that he felt he had enough probable cause to arrest the person in the car without a warrant.

The information known by the officers at the time of Payne's arrest could cause a reasonable and prudent officer to believe a

felony had been or was being committed. At the very least, the officers knew Payne was in possession of a vehicle that belonged to a murder victim and saw Payne glancing furtively before approaching and entering the vehicle. The trial court did not err in finding that probable cause existed for Payne's arrest; thus, that the arrest was lawful.

3. Seizure of the crack pipe.

Next, we consider the reasonableness of the search leading to the seizure of the crack cocaine pipe from Payne's shirt pocket.

An officer's search of an arrested person incident to an arrest is a well-established exception to the requirement of a search warrant. Police may conduct a warrantless search of an arrested person, and in addition the immediate surrounding area may be searched contemporaneously with the arrest. See *New York v. Belton*, 453 U.S. 454, 457, 69 L. Ed. 2d 768, 101 S. Ct. 2860, *reh. denied* 453 U.S. 950 (1981).

The Kansas Legislature has codified this exception in K.S.A. 22-2501, which states:

"When a lawful arrest is effected a law enforcement officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of
"(a) Protecting the officer from attack;
"(b) Preventing the person from escaping; or
"(c) Discovering the fruits, instrumentalities, or evidence of the crime."

Payne argues on appeal that the crack cocaine pipe should have been suppressed by the trial court because it was evidence obtained as the result of an illegal search.

Following the arrest, officers assisted Payne in standing up, and then conducted a pat-down search. Officer Tavano testified that he felt a pipe in Payne's shirt pocket as he patted him down for weapons as soon as they picked Payne up off the ground. Officer O'Brien testified that Tavano pulled some cards out of one of Payne's pockets and, after they put Payne in the back of a police vehicle, Tavano struggled to put the two cards back in Payne's left shirt pocket. According to O'Brien, at that time Tavano looked at what was in Payne's pocket and found the crack pipe. At the preliminary hearing, Tavano stated: "I felt the pipe, it was short, I am

familiar with it, what a Crack pipe is. I knew it to be nothing else but a pipe and removed it."

"Under the plain view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Wonders*, 263 Kan. 582, Syl. ¶ 3. "The plain feel exception . . . is applicable to lawful searches in Kansas." 263 Kan. 582, Syl. ¶ 7. "The legality of a law enforcement officer's seizure of property in plain view or on plain feel is immediately apparent if there is reasonable or probable cause to associate the property with criminal activity." 263 Kan. 583, Syl. ¶ 11.

Here, officers conducted a search of Payne's person following his arrest in an attempt to locate any weapons he might be carrying. Their actions can be characterized as a search for the purpose of protecting the officers from an attack or to keep Payne from escaping. Further justification for the search can be found in the plain feel exception.

The trial court correctly denied Payne's motion to suppress the crack pipe. Payne's argument that the search was not legal is without merit.

4. Seizure of the crack cocaine.

Payne also argues that the rock of cocaine discovered in his shirt pocket at the police station should be suppressed.

In *State v. Copridge*, 260 Kan. 19, 918 P.2d 1247 (1996), the defendant argued that the district court erred in failing to suppress evidence collected during a search of his personal effects and clothes conducted while officers booked him into jail. This court found that the defendant's effects were lawfully seized, and, therefore, officers could search them without a warrant or probable cause. There, we stated:

"[W]here a defendant has been taken into custody and his or her personal effects have been lawfully seized and retained for safekeeping, the defendant has no expectation of privacy and officers may thereafter take a 'second look' at the inventoried personal effects without a search warrant and remove any evidence." 260 Kan. at 23.

" ' "While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.' " [Citation omitted.]" 260 Kan. at 24 (quoting *United States v. Edwards*, 415 U.S. 800, 808-09, 39 L. Ed. 2d 771, 94 S. Ct. 1234 [1974]).

The search of Payne's person at the jail was a reasonable custodial search for weapons, means of escape, and evidence. Payne's assertion of error fails.

## II. STATEMENTS TO POLICE AND INMATES

Next, Payne challenges the propriety of the trial court's denial of his motion to suppress statements he made during his arrest and to inmates at the Leavenworth County jail.

" 'When analyzing a district court's suppression of evidence, an appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review.' " *State v. Pritchett*, 270 Kan. 125, 128, 11 P.3d 1125 (2000) (quoting *State v. Toothman*, 267 Kan. 412, Syl. ¶ 1, 985 P.2d 701 [1999]).

In arguing this second assertion of error, Payne employs essentially the same reasoning in his argument for the suppression of the crack pipe and rock of crack cocaine. Payne contends there was insufficient probable cause for an arrest and, therefore, the officer's warrantless searches during his detention were per se unreasonable. Building on these assumptions, Payne then argues that "all evidence [his statements] recovered subsequent[ly] . . . should have been suppressed."

"The prosecution has the burden of proving whether a confession or admission is admissible. On appeal, an appellate court will not reverse a determination that a confession was freely, voluntarily, and intelligently given if there is substantial competent evidence to support the determination. The legal conclusion drawn from those facts is reviewed de novo." *State v. Jacques*, 270 Kan. 173, Syl. ¶ 4, 14 P.3d 409 (2000).

"Substantial evidence is evidence that possesses both relevance and substance and furnishes a substantial basis of fact from which the issues can reasonably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable

person might accept as being sufficient to support a conclusion." 270 Kan. 173, Syl. ¶ 5.

First, we note that Payne does not contest the trial court's admission of the statements he made during custodial police interviews. During those interviews, Payne was advised of his *Miranda* rights and voluntarily signed waiver forms. Payne only challenges the statement he made during his arrest and the statement he made to a fellow inmate at the Leavenworth County jail.

First, we consider Payne's statement at the scene of his arrest. When police officers apprehended Payne, they failed to read him his *Miranda* rights. Officer Slusher testified that Payne's statement during the arrest indicated his potential involvement in Harris' murder.

"In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held the prosecution cannot use statements, whether inculpatory or exculpatory, stemming from custodial interrogation, unless it proves that procedural safeguards were used to secure the defendant's privilege against self-incrimination. These safeguards include informing the person in custody, prior to interrogation, of his or her Fifth Amendment rights to remain silent, to consult with an attorney, and to have an attorney present during interrogation. Further, if the person in custody states that he or she wants an attorney, all questioning must cease until the attorney is present. [Citations omitted.] A waiver of *Miranda* rights need not be in writing. [Citation omitted.]" *State v. Williams*, 268 Kan. 1, 12-13, 988 P.2d 722 (1999).

As we noted above, clearly Payne was in police custody and placed under arrest at that time. The officers had not advised Payne of his *Miranda* rights when he made the statement. The question for our consideration here is whether his statement was voluntary or was made in response to interrogation.

Interrogation in the context of police custody refers to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). "[T]he voluntariness of a statement should be determined on the basis of the totality of the surrounding cir-

cumstances." *State v. Ferguson*, 254 Kan. 62, 85, 864 P.2d 693 (1993).

Officer Slusher testified that "[officers] were leading [Payne] away and he like stopped and looked towards me and said, 'So Eddie Harris is dead?'" None of the officers present had mentioned that Harris was the murder victim. There was no evidence to suggest that this statement was made in response to an inquiry of police. Significantly, Payne does not assert on appeal that this statement was made in a nonvoluntary manner or as a result of police coercion. We find that Payne's statements during his arrest were not the result of interrogation and were made voluntarily.

Next, we consider Payne's statement to inmate McCoy at the Leavenworth County jail. McCoy testified that Payne told him that when Harris refused to buy drugs, it made Payne and Browning angry. McCoy said, according to Payne's story, Browning started to beat Harris and Payne joined in, and then they stabbed him a couple of times.

Once again, there is no evidence suggesting that Payne's statements to McCoy were the result of police interrogation or were not voluntarily made. Nor is there any assertion by Payne that this statement was nonvoluntary or the result of police coercion.

Substantial evidence supports the trial court's decision to deny Payne's motions to suppress. Further, because we have determined that the officers lawfully arrested Payne, his intimation that these statements should have been suppressed as "the fruit of the poisonous tree" is incorrect. We conclude that substantial competent evidence supports the trial court's decision to refuse to suppress these statements.

## III. SUFFICIENCY OF EVIDENCE

Finally, Payne contends that if the drugs, the crack pipe, and his statements had been properly suppressed as the fruit of the poisonous tree of his illegal arrest, "then there would have been no evidence harmful to Mr. Payne, except the lone fact that he was found in possession of Mr. Harris' car."

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light

most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

Here, we found the trial court properly denied Payne's motions to suppress the crack cocaine, the pipe, and Payne's statements. The challenged evidence does not constitute fruit of the poisonous tree of an illegal arrest.

Viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found Payne guilty beyond a reasonable doubt.

Affirmed.