No. 91,284

STATE OF KANSAS, *Appellee*, v. WILSON TERMAINE INGRAM II, *Appellant*.

113 P.3d 228

Opinion filed June 3, 2005.

*Barry A. Clark,* Clark & Kellstrom, Chtd., of Manhattan, argued the cause and was on the brief for appellant.

*Bethany C. Fields*, assistant county attorney, argued the cause, and *Barry Wilkerson*, county attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: This case involves the inevitable discovery doctrine. A jury convicted Wilson Ingram of aggravated battery, possession of cocaine, possession of marijuana, and failure to have a tax stamp affixed. In an unpublished decision dated February 14, 2003, the Court of Appeals held that the police illegally searched Ingram to find the drugs but remanded for the district court to determine whether the evidence would have been inevitably discovered.

On remand, the district court determined that the drugs would have been discovered when Ingram was brought to the jail for questioning about the aggravated battery. In another unpublished decision dated September 3, 2004, the Court of Appeals affirmed the district court. We granted Ingram's petition for review pursuant to K.S.A. 20-3018(b).

The sole issue on appeal is whether the district court correctly held that the evidence would have been inevitably discovered. We answer "yes" and affirm the Court of Appeals and the district court.

## FACTS

Wilson Termaine Ingram II was arrested following an incident during the early morning hours of September 2, 2000, in Manhattan in which Matthew Siebrandt was stabbed in the groin. When police officers found Ingram, they handcuffed him and searched his pockets, finding three rocks of crack cocaine and marijuana.

On March 12, 2001, Ingram filed a motion to suppress the drug evidence. At the hearing on the motion, the State presented evidence through the testimony of Sergeant Steve Boyda and Officer Gretchen Bertrand.

According to Boyda, at 4:20 a.m. on September 2, he received a dispatch that a stabbing had occurred at the University Commons apartment complex at 2215 College Avenue. Dispatch also informed him that the suspect, who was described as a black male in a Hawaiian shirt and dark blue jean shorts, was being chased to

the north of the complex by several people who had been at the stabbing scene.

Boyda drove to an area north of the complex and waited. He soon saw a black male wearing a Hawaiian shirt and dark colored jean shorts (Ingram) running north between two homes. Boyda drove toward Ingram, got out of his car, and yelled, "Police, stop." Ingram slowed to a fast walk, but continued moving away from Boyda. When Boyda drew his weapon and told Ingram to get on the ground, Ingram complied. Ingram had his hands under his chest, and Boyda was concerned for his safety, not knowing if Ingram still had the weapon. Boyda told Ingram to take his hands out and stayed 10 feet away until Officer Bertrand arrived.

When Officer Bertrand arrived, Boyda told her to place Ingram in handcuffs because of a concern for the officers' safety and because Boyda noticed that Ingram had a bloody lip, some blood on his shirt, and scratches on his forearms and legs. At this time, he believed that Ingram had been involved in the stabbing. Boyda instructed Bertrand to check Ingram's pockets and told him to just calm down.

Boyda testified that while Ingram was still on the ground, Bertrand removed several large rocks of what appeared to be crack cocaine from one of Ingram's front pockets. Bertrand did not find any weapons, so Boyda stood him up and advised him that he was under arrest for possession of a controlled substance and that he was being detained because Boyda believed he had been involved in the stabbing. Boyda then found small amounts of marijuana in Ingram's pocket.

Based upon the man's clothing, *i.e.*, matching the description of the stabbing suspect, Boyda planned to transport him to the Riley County Police Department for further investigation. According to Boyda, Ingram would have been taken to the secure part of the facility, where a corrections officer would have performed an extensive check for weapons. While Boyda was not aware of any officer effecting a probable cause arrest of Ingram for the stabbing incident, he believed there was enough evidence to arrest Ingram for aggravated battery, *i.e.*, Ingram would not have been free to go even if the drugs had not been found.

According to Officer Bertrand, she heard Sergeant Boyda state over the radio that he believed he saw the suspect running between two homes in the area. When she arrived, Boyda directed her to place handcuffs on a black male he was holding at gunpoint in the prone position. Bertrand then handcuffed Ingram.

As Bertrand had approached Ingram and made further observations, she felt she had probable cause to believe that Ingram had committed the stabbing. He not only matched the description of the suspect very well, *i.e.*, a black male with dark long baggy shorts and a Hawaiian shirt; but he also had blood spots on his shirt and jeans, his shorts were soaking wet, one of his eyes was swollen, he had blood on his lips and behind an ear, and he had scratch marks on his arms. It appeared to Bertrand that Ingram had been in a physical altercation and that his wounds were fresh.

The district court denied Ingram's motion to suppress. A jury convicted Ingram of aggravated battery, possession of cocaine, possession of marijuana, and failure to have a tax stamp affixed.

Ingram appealed to the Court of Appeals, which held that the police illegally searched him to find the drugs. It remanded for district court determination of whether the evidence would have been inevitably discovered.

On remand, the district court held a hearing in which Sergeant Boyda again testified, elaborating upon his testimony at the suppression hearing. He stated that because Ingram was a stabbing suspect, he had instructed Bertrand to take Ingram to the jail side, and not the police department side, of the Riley County Law Enforcement Center (Center). Violent crime subjects are interviewed in the secure facility on the jail side. Boyda also testified that Ingram's contraband played a part in his decision to have Ingram taken to the jail side. Moreover, Boyda was familiar with Ingram; Ingram had previously shot at a cab driver and there was an alert for officer safety because of his past actions.

Boyda testified that the procedures used when taking someone into the secure area required that he or she be searched for any weapons or contraband prior to being allowed in the interview rooms or in the main facility at the jail. After the person empties

his or her pockets, the corrections staff confirms that all items have been removed from the pockets, shoes, and coat.

According to Boyda, Ingram was under arrest for the drug charges and was also being detained for questioning concerning the stabbing. Ingram was not arrested for the stabbing because the victim, Matthew Siebrandt, did not wish to file charges.

The complaint filed against Ingram 6 days later on September 8, 2000, did not include a charge of aggravated battery. According to Ingram's counsel at oral arguments before this court, this charge was not made until some weeks later.

The district court held that despite Boyda's testimony that he did not actually arrest Ingram for the aggravated battery, Ingram was essentially arrested because his freedom to leave was restricted for several hours. The court also concluded that had Officer Bertrand not ventured into Ingram's pockets, the jailer would have done so when Ingram arrived at the jail. The drugs then would have been inevitably discovered. Ingram's counsel then asked for a finding that the detention was supported by reasonable suspicion, but not by probable cause.

The district court stated:

"Well, let me just think through here. What do we know about this? The man is dressed as was reported, as I remember, he's running north, he stops, he's found to have blood on his shirt, he's found to have a bloody lip, the officer knew him. . . . *There probably was not probable cause to arrest him. There probably was reason to detain him for questioning.* And this is — this is where it gets really gray, the difference between an arrest and a detention. Now the words are batted back and forth and one supposedly doesn't mean the other, but one often is the other. A lengthy detention is — can very well in my mind be considered to be an arrest as I believe this was in this case. And then he was ultimately released from that arrest." (Emphasis added.)

The Court of Appeals concluded: "[T]here were many factors that indicated the drug evidence would have inevitably been discovered by lawful means."

## ANALYSIS

Issue: *Did the district court err in holding that the evidence would have been inevitably discovered?*

The test under the inevitable discovery rule is that, if the prosecution establishes by a preponderance of the evidence that the unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. *State v. Brown*, 245 Kan. 604, 612, 783 P.2d 1278 (1989) (citing *Nix v. Williams*, 467 U.S. 431, 444, 81 L. Ed. 2d 377, 104 S. Ct. 2501 [1984]).

Ingram argues that the evidence should have been suppressed because, although it would have been discovered during the security search at the Center, he had not been arrested, and the police cannot search a suspect who simply has been brought into a secure facility for questioning. Ingram argues in the alternative that even if he had been arrested, no probable cause existed to support it. Accordingly, the drugs could not have been found by lawful means and the inevitable discovery doctrine would not apply.

The State responds that had the drugs not been found at the scene, Ingram would have been subject to arrest for the aggravated battery based upon probable cause, and that the corrections staff would have found the drugs at the Center during the security search.

We acknowledge that absent probable cause or a warrant, a person cannot be forcibly taken to the police station and detained, although briefly, for investigative purposes. *Hayes v. Florida*, 470 U.S. 811, 816, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985). Such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause. *Hayes*, 470 U.S. at 816. However, Ingram was essentially arrested for the crime of aggravated battery, and probable cause supported his arrest. Accordingly, the subsequent security search at the Center was valid, and the drugs would have been inevitably discovered.

Our analysis begins with an acknowledgment that when reviewing any motion to suppress evidence, an appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. The ultimate

determination of the suppression of evidence is a legal question requiring independent appellate review. *State v. Horn,* 278 Kan. 24, 30, 91 P.3d 517 (2004). When, as here, the material facts are not in dispute, the suppression question is solely one of law. *State v. Ramirez,* 278 Kan. 402, 404, 100 P.3d 94 (2004).

Ingram first argues that he should not have been subject to a security search because he simply had been brought to the Center for questioning about the stabbing. We disagree. The detention under these circumstances is sufficiently like an arrest. See *Hayes v. Florida,* 470 U.S. at 816. More specifically, *State v. Payne,* 273 Kan. 466, 44 P.3d 419 (2002), contains numerous parallels to the instant case.

In *Payne,* a murder victim's car which had been missing was found on the street several days after his death. The police surveiled the car and were instructed to bring anyone who tried to enter it to the police station. That night Payne got inside the car.

With guns drawn, one officer pulled Payne out of the car and placed him on his chest in the roadway while another handcuffed him. Another officer patted him down for weapons and retrieved a crack pipe. Payne was not told he was being arrested at that time, no arrest warrant had been issued, and none of the officers read him his *Miranda* rights. However, one officer felt he had enough probable cause to arrest Payne without a warrant while Payne was still in the car. When Payne asked why he was being taken into custody, he was simply told "for a suspicious death." 273 Kan. at 468.

In support of his motion to suppress the crack pipe found at the scene, Payne argued that he had not been arrested because, among other things, two police officers testified that they did not believe it was an arrest. He contended that since he was not under arrest, since the officers were not armed with a search warrant, and since the officer had no probable cause to believe what he had felt in Payne's pocket was a weapon, the act of reaching into his pocket was an intrusive, unwarranted, and illegal search.

The district court had ruled the police officers had not merely detained Payne but had essentially arrested him. We noted that an arrest is "the taking of a person into custody *in order that the*

*person may be forthcoming to answer for the commission of a crime,"* whereas a detention is a *"temporary restraint* of a person by a law enforcement officer." (Emphasis added.) 273 Kan. at 472-73. We concluded that the police did more than temporarily restrain or detain Payne, stating:

"Nothing in the record indicates that officers would allow Payne to proceed to the station for further investigation on his own accord. As one officer noted, 'when you are taken out of a car at gunpoint, you are under arrest and you are not free to go.' Payne admits that at that point, he was 'no longer free to leave.' Reviewing the totality of the circumstances, Payne's freedom of movement was restrained to the degree associated with a formal arrest." 273 Kan. at 473.

We hold that the police essentially arrested Ingram.

In the alternative, Ingram argues that no probable cause existed to support his arrest. When a motion to suppress is based upon an alleged lack of probable cause to arrest, we examine the totality of the circumstances from the standpoint of an objectively reasonable police officer. *Ramirez,* 278 Kan. at 407; *Payne,* 273 Kan. at 474-75; see *Ornelas v. United States,* 517 U.S. 690, 696, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). Whether the officers themselves believed they had probable cause is not determinative. See *Ramirez,* 278 Kan. at 407.

Determining whether probable cause to arrest exists under our undisputed facts affords us a de novo review. See *Ramirez,* 278 Kan. at 404; *City of Dodge City v. Norton,* 262 Kan. 199, 203, 936 P.2d 1356 (1997) (undisputed information known to police officer sufficient to establish probable cause to arrest). Thus, the district court's determination of no probable cause is entitled to no appellate deference.

Under Kansas law, a law enforcement officer can make a warrantless arrest when he or she "has probable cause to believe that the person is committing or has committed a felony. K.S.A. 2003 Supp. 22-2401." *Ramirez,* 278 Kan. at 405. There we observed:

" 'Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being

committed.' " *Ramirez,* 278 Kan. at 405 (quoting *State v. Abbott,* 277 Kan. 161, Syl. ¶ ¶ 2-3, 83 P.3d 794 [2004]).

A stabbing can qualify, among other things, as the felony crime of aggravated battery under K.S.A. 21-3414.

During our de novo review, we observe that the undisputed information available to the officers at the time of the incident is as follows. A person matching the description of the assailant in a stabbing — by gender, race, Hawaiian shirt, and dark blue jean shorts — was seen by Sergeant Boyda running in the direction away from the scene. The man's running was also consistent with dispatch's notification that the assailant was being chased by several people at the scene. When ordered to stop, the man merely slowed to a fast walk, away from the fight and Boyda. Once the suspect was on the ground, Boyda noticed he had a bloody lip, blood on his shirt, and scratches on his forearms and legs. Like Boyda, Bertrand noticed the blood on his lip and shirt and scratches on his arms. She also noticed blood on his jeans and behind his ear, his swollen eye, and his soaking wet shorts. It appeared to Bertrand that the suspect had been in a physical altercation and that his wounds were fresh.

To paraphrase *Ramirez,* we hold that the totality of the circumstances within the law enforcement officers' knowledge was sufficient to warrant a person of reasonable caution in the belief that the felony offense of aggravated battery had been committed by Ingram. Because we conclude that there was probable cause to arrest, any security search that was done at the Center was lawful. The State has shown by a preponderance of the evidence that the drugs found by Officer Bertrand at the scene would have been inevitably discovered by corrections officers at the Center. See *State v. Waddell,* 14 Kan. App. 2d 129, 784 P.2d 381 (1989) (drugs in defendant's pants pockets illegally seized at scene would have been inevitably discovered by lawful means by the police during an inventory search at the jail); see also *State v. Payne,* 273 Kan. at 477 (motion to suppress crack cocaine found in defendant's pocket in jail was denied because "the search of Payne's person at the jail was a reasonable custodial search for weapons, means of escape, and evidence").

The Court of Appeals is affirmed. The district court is affirmed.

LOCKETT, J., Retired, assigned.