NOT DESIGNATED FOR PUBLICATION

No. 115,956

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REBECCA A. BLACKBURN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Clay District Court; JOHN F. BOSCH, judge. Opinion filed May 19, 2017. Affirmed.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Richard E. James*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., HILL and SCHROEDER, JJ.

*Per Curiam*:  We must answer several questions in this appeal. Can a deputy stop a pickup truck at night for having a broken taillight? Can the deputy then search the truck after a drug-sniffing dog alerts near the truck? Can the deputy then arrest the driver of the truck for possession of drug paraphernalia after finding a cut straw and plastic mirror both with white residue on them in the truck? Should the trial court have suppressed the methamphetamine discovered in the driver's shoe when the deputy searched her just before arresting her? We answer the first three questions yes and the last question no. We affirm Rebecca A. Blackburn's conviction for possession of methamphetamine.

1

*The deputy noticed a taillight.*

Around 8:30 the evening of March 20, 2015, Clay County Sheriff's Deputy Jeffrey Browne noticed a pickup truck ahead of him that had a taillight emitting white light instead of red. Browne had been following the truck at a distance of about one-half of a block. Because the taillight was emitting white light, the deputy decided to make a traffic stop. The white light was the first type of light he saw from the truck. He later described the light as "pretty strong."

As the truck was stopping, Deputy Browne saw that the passengers were moving around inside the cabin of the truck. He walked up to the truck and told the driver— Rebecca Blackburn—the reason for the stop. Blackburn told him the taillight was damaged because she had previously rolled the truck. There were two passengers in the truck with Blackburn. Neither passenger was wearing a seat belt.

Deputy Browne returned to his patrol vehicle to make license checks on Blackburn and the passengers. Before checking the licenses, however, Deputy Browne asked the undersheriff to come to the scene with his drug-sniffing dog. The dispatcher told Deputy Browne that one of the passengers had a warrant for her arrest. Another officer arrived at the scene and arrested that passenger. While Deputy Browne was writing traffic citations for the seat belt violations and the broken taillight, the undersheriff arrived with his dog. It sniffed around Blackburn's truck and alerted at the passenger side door.

After the dog alerted, the officers removed Blackburn and the remaining passenger from the pickup and performed a pat-down search of both. No contraband was found as a result of the pat down. Deputy Browne searched the passenger side portion of the truck while the undersheriff searched the driver's side. During the search, Deputy Browne found a cut straw with white residue on the passenger floorboard and a "small, black, plastic mirror-type object" with white powdery residue in the glove compartment.

2

Deputy Browne believed these objects were drug paraphernalia—used for nasally ingesting drugs. He performed a field test for methamphetamine on the cut straw. The test did not indicate the presence of methamphetamine, but it was positive for the presence of amphetamine. Deputy Browne then searched Blackburn's person and had her take off her shoes. He found a baggie containing a white crystal substance, later identified by the KBI as methamphetamine, in Blackburn's shoe. Blackburn was taken into custody. Subsequent laboratory testing also revealed that the cut straw tested positive for methamphetamine.

The State charged Blackburn with possession of methamphetamine and operating a vehicle with a broken taillight. Blackburn moved to have the evidence found during the stop suppressed for two reasons. First, the deputy did not have a reasonable suspicion to make a legitimate traffic stop. In her view, the plain language of the taillight statute did not make driving with cracks in a taillight that emitted white light illegal. Therefore, the deputy lacked a reasonable suspicion to even stop the truck. Second, she contends the deputy did not have probable cause to arrest her because the field test of the straw was negative for methamphetamine. The district court denied her motion. The court later found Blackburn guilty after a bench trial on stipulated facts. Blackburn appeals the denial of her motion to suppress and the resulting conviction.

To us, Blackburn contends that the deputy was not justified in stopping her truck because the State could not prove that the truck's taillight could not emit red light visible at a distance of 1,000 feet as required by K.S.A 8-1706. After all, the deputy first noticed the truck just about one-half of a block ahead of him—not 1,000 feet. She also argues that since the field test of the cut straw was negative for methamphetamine then the deputy had no reason to arrest her on suspicion of possession of drug paraphernalia.

*The traffic stop here was legal.*

Blackburn challenges the legality of the initial traffic stop. Appellate courts have separated public encounters of police with citizens into four categories—voluntary, investigatory, public safety, and arrests. See *State v. McGinnis*, 40 Kan. App. 2d 620, 623-24, 194 P.3d 46 (2008). Here, the traffic stop for a cracked taillight falls into the investigatory detention category. An investigatory detention is permissible if the police have reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 27-28, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); see K.S.A. 22-2402. A violation of the traffic code or a traffic ordinance can provide reasonable suspicion to stop a vehicle. *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

Here, the facts are not in dispute. Deputy Browne, at night, saw a vehicle with a cracked taillight driving down the street. He saw white light emitting from the taillight. The white light was "pretty strong" and he noticed it before seeing any other type of light. The deputy made a traffic stop based upon what he perceived to be a possible traffic infraction.

The applicable statute, K.S.A. 8-1706(a), part of the Uniform Act Regulating Traffic Equipment of Vehicles, K.S.A. 8-1701 *et seq.*, provides that a vehicle must be equipped with two taillights that emit visible, red light at a distance of 1,000 feet. Deputy Browne first saw the pickup from the rear at a distance of about one-half of a block—less than 1,000 feet. At this distance, Deputy Browne saw that the truck was emitting white light. Did this observation provide Deputy Browne with a reasonable suspicion that the vehicle was in violation of K.S.A. 8-1706?

Reasonable suspicion exists if at the time of the stop an officer has specific, articulable facts that criminal activity has occurred, is occurring, or is about to occur. *State v. Coleman*, 292 Kan. 813, 817, 257 P.3d 320 (2011). Certainly, Deputy Browne

4

specified his reasons for stopping the truck—the broken taillight emitting white light. The law requires two functioning taillights, not one.

We must evaluate reasonable suspicion from the viewpoint of a trained law enforcement officer. *State v. Pollman*, 286 Kan. 881, 890, 190 P.3d 234 (2008). Deputy Browne saw white light being emitted from Blackburn's taillight. He testified that in his experience, the white light would overpower the red light the further away the light is viewed from the source. This is a safety concern that we cannot reasonably ignore. A bright white light shining into the eyes of drivers approaching the rear of the truck could have their vision impaired; thus, creating a traffic hazard. Therefore, we hold that the white light being emitted from the taillight provided Deputy Browne with reasonable suspicion that a traffic infraction might be occurring and the stop was reasonable.

For her part, Blackburn argues that because Deputy Browne did not observe her vehicle from a distance of 1,000 feet then there can be no reasonable suspicion that a crime occurred. Additionally, she argues under the plain language of the statute that a taillight emitting white light is not a violation of the statute. She confuses the issues.

The question of proof of the traffic violation is not before us at this stage of our analysis. At this point, we must determine if the traffic stop was reasonable. An investigatory stop only requires a minimum level of objective justification. See *Terry*, 392 U.S. at 27-28. Deputy Browne did not have to observe the truck from a distance of 1,000 feet to have reasonable suspicion that a traffic infraction occurred or check to see if the driver knew her taillight was broken. Also, this safety statute requires two functioning red taillights—not one red and one red-and-white light.

Blackburn relies upon *State v. Knight,* 33 Kan. App. 2d 325, 104 P.3d 403 (2004), as support. The case is no help to her cause. In *Knight,* an officer stopped a car when the driver did not use a turn signal when exiting a parking lot onto a main street. The traffic

5

ordinance in *Knight* only involved traffic movements while on a public street and not when moving from a private road, like a parking lot, onto a public street. Because the officer did not observe any activity which could possibly constitute a crime, the panel held that there was no reasonable suspicion for a stop. 33 Kan. App. 2d at 327.

Our facts here are distinguishable. Deputy Browne observed a possible violation of the statute—one functioning taillight and one taillight emitting white light. In *Knight*, there was no observed activity that could constitute a crime. Because of the safety concern and the possibility that what Deputy Browne observed was a crime, we hold that it was reasonable for him to investigate further and stop the truck.

*The second search of Blackburn occurred immediately before her arrest.*

Our determination of probable cause must be made within a factual context. Such a determination is a fact-specific inquiry. The facts known to Deputy Browne prior to his arrest of Blackburn are determinative. We relate what we have gleaned from the record.

Deputy Browne saw the passengers in the truck suspiciously moving around after he stopped the truck. A drug-sniffing dog had alerted by the passenger side door of the truck. A cut straw with white residue was found on the passenger side floorboard. A black, plastic, mirror-like object with white residue was found in the passenger side glove compartment. Finally, Deputy Browne knew that all three occupants in the pickup had been previously charged with drug crimes.

According to Deputy Browne, the major factor he relied upon as probable cause for the arrest was the presence of what he believed was drug paraphernalia in the truck. The items believed to be drug paraphernalia were the cut straw and the black, plastic, mirror-like object, both of which had a white powdery residue on them. Deputy Browne testified that in his training and experience a cut straw and a flat surface is used for

6

snorting drugs. Even though the field test was negative for methamphetamine it was positive for amphetamine, which can be obtained by prescription. The deputy also stated he had never seen a cut straw used to inhale a prescription narcotic.

The drug paraphernalia possession crime is set out in K.S.A. 2016 Supp. 21-5709(b)(2), which provides: "It shall be unlawful for any person to use or possess with intent to use any drug paraphernalia to: . . . (2) store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body."

When determining probable cause, the facts are viewed from the perspective of a trained law enforcement officer. Reasonable inferences from the facts are permitted. *State v. Payne*, 273 Kan. 466, 474, 44 P.3d 419 (2002). We need not repeat what we stated above about the furtive movements of the passengers, the alert of the drug dog, and the white residue found on two items. But considering these circumstances, it was reasonable for Deputy Browne to conclude the cut straw and the black, mirror-like object were drug paraphernalia.

Next we must also look at the legal term "possession." When dealing with controlled substances, possession means "having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2016 Supp. 21-5701(q).

A useful case on this point is *Maryland v. Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003). In *Pringle*, a police officer stopped a car with three occupants. A search of the car revealed multiple baggies of cocaine. The police arrested all three occupants. The United States Supreme Court found that probable cause existed for the arrest because it was reasonable to infer a common enterprise among the occupants of the

7

vehicle. 540 U.S. at 372. In reaching this decision, the Court relied upon the fact that the officer had no information linking a specific passenger to the cocaine. 540 U.S. at 374.

Here, the facts are analogous to *Pringle*. The cut straw and mirror-like object were found on the passenger floor board and in the glove compartment. Deputy Browne's inference that Blackburn had at least knowledge of the presence of the cut straw and mirror-like object is reasonable. "'[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.' [Citation omitted.]" *Pringle*, 540 U.S. at 373. Deputy Browne had no information that would single out a passenger in the truck as the owner of the paraphernalia; thus, it is reasonable for him to believe that Blackburn had possession of the drug paraphernalia. See 540 U.S. at 374. The facts known to the deputy at the time of arrest support probable cause to believe that Blackburn had possession of the drug paraphernalia. With probable cause, an arrest is legally possible.

To the contrary, Blackburn argues that a field test performed on the cut straw eliminates Deputy Browne's probable cause. Indeed, Deputy Browne performed a field test to determine if there was methamphetamine on the cut straw. The field test did not indicate the presence of methamphetamine but did indicate the presence of amphetamine.

The field test being negative for methamphetamine does not eliminate Deputy Browne's probable cause, and we question whether it even weakens it. We are concerned with probable cause here, not a determination of guilt. In determining whether probable cause exists we look at both inculpatory and exculpatory facts. See *State v. Edgar*, 296 Kan. 513, 525, 294 P.3d 251 (2013). The fact that the cut straw did not test positive for methamphetamine but positive for amphetamine does suggest that the cut straw had been used to inhale amphetamine. Probable cause is based upon the relative weight of probabilities. Even with the negative field test, Deputy Browne was reasonable in his belief that the cut straw had been used to ingest drugs. The suspicion was reasonable:  the

straw and mirror-like object, both with a white substance on them, were drug paraphernalia.

Blackburn also argues that there were innocuous reasons for having a cut straw and a mirror-like object. Her argument concerning the straw is not persuasive because it was a cut straw *with white residue on it*. From the perspective of a trained law enforcement officer, it is much more likely that a cut straw with white residue is drug paraphernalia than there being an innocuous reason for it being in the truck.

Turning to the mirror-like object, Blackburn argues there are many reasons to possess a mirror and cites *Knight* as authority. In *Knight*, this court held there was no reasonable suspicion for a stop when a person bought water, two packs of cold medicine, and salt in a single purchase. These items are used in the manufacturing of methamphetamine. The court held that salt was so ubiquitous a substance that even with the purchase of the other items it did not amount to reasonable suspicion. 33 Kan. App. 2d at 327-28. Blackburn argues that possessing the mirror-like object is analogous to purchasing salt in *Knight*.

We are not convinced. Here, the facts are distinguishable from *Knight*. At times, it is referred to as a "mirror-like object" and other times as a "mirror." If we assume the item is a mirror, we acknowledge that there are many noncriminal reasons to carry a mirror. But here, the mirror was found close to a cut straw. Both items had white residue on them. While in *Knight* it was unreasonable to suspect from the purchase of salt, water, and cold medicine that a person is manufacturing methamphetamine, it is not unreasonable to suspect that a cut straw and mirror with white residue on them are drug paraphernalia. The proximity of the objects connected with the presence of the white residue, when considered together with all the other facts we have mentioned is a far cry from being similar to someone buying salt at a grocery store.

9

In light of all the facts known to Deputy Browne prior to arresting Blackburn, a reasonable officer could believe that Blackburn had possessed drug paraphernalia. Therefore, we hold there was probable cause for the arrest.

Affirmed.