NOT DESIGNATED FOR PUBLICATION

No. 115,087

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROCCO ERIC POSSEMATO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Opinion filed January 5, 2018. Reversed and vacated.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., PIERRON, J., and BURGESS, S.J.

PER CURIAM: This case involves the traffic stop of a car traveling on I-70 in Geary County. Sheriff Deputy Justin Stopper initiated the traffic stop of a vehicle driven by Sean Possemato (Sean), and occupied by Sean's brother, Rocco Eric Possemato (Possemato), who was a passenger in the car. Sean was stopped for improper driving on a two-lane highway. According to Deputy Stopper, the car was driving in the left lane of traffic on I-70 in violation of K.S.A. 2016 Supp. 8-1522(c), which prohibits a driver from driving in the left lane of an interstate unless the driver is in the process of passing another vehicle or avoiding an obstruction on the roadway. After the car was stopped, a drug dog was brought to the stopped car to execute a drug sniff. When the officers

1

informed Sean and Possemato that the dog indicated the presence of narcotics, Sean admitted to having 19 pounds of drugs in the trunk of the car. The officers searched the car and found a large quantity of high-grade marijuana in vacuum-sealed bags in the trunk.

Possemato ultimately was charged with possession of marijuana with the intent to distribute, conspiracy to possess marijuana with intent to distribute, and no drug tax stamp. Possemato filed a motion to suppress Sean's statements and the marijuana discovered, arguing that this evidence was discovered after an unlawful detention and dog sniff and therefore should have been suppressed as fruit of the poisonous tree. After an evidentiary hearing, the district court denied Possemato's motion to suppress. A jury ultimately acquitted Possemato on the possession of marijuana with the intent to distribute and no drug tax stamp charges but convicted Possemato of conspiracy to possess marijuana with the intent to distribute.

Possemato appeals his conviction, arguing (1) K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague and therefore failed to provide the reasonable suspicion necessary to conduct the traffic stop in this case; (2) the district court should have granted his motion to suppress Sean's statements and the marijuana discovered; and (3) the evidence presented at trial was insufficient to support the conspiracy conviction. For the reasons stated below, we are not persuaded that K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague or that the district court erred in denying Possemato's motion to suppress. Nevertheless, we agree with Possemato that the evidence presented at trial is insufficient to support the conspiracy conviction. Accordingly, we vacate Possemato's conviction for conspiracy to possess marijuana with intent to distribute.

I. *K.S.A. 2016 Supp. 8-1522(c)*

A. *Standing*

Before reaching the merits of Possemato's claim that K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague as applied to him, this court first must determine whether Possemato has standing to challenge the statute as unconstitutional. The standing issue was not addressed by the district court or by either party, but standing is a component of subject matter jurisdiction and may be raised at any time. Whether a defendant has standing to challenge a search is a legal question subject to de novo review. *State v. Gilbert*, 292 Kan. 428, 431-32, 254 P.3d 1271 (2011). "Standing" is really "a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action." *United States v. Kimball*, 25 F.3d 1, 5 n.1 (1st Cir. 1994).

The Fourth Amendment to the United States Constitution protects the public from warrantless searches by the government. Under the Fourth Amendment, individuals have the right to be free from unreasonable governmental searches and seizures. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). Evidence obtained as the result of an unconstitutional search is inadmissible and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484-87, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Fourth Amendment rights are personal rights, and therefore, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. [Citation omitted.]" *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S. Ct. 421, 58 L. Ed. 387 (1978); see *Gilbert*, 292 Kan. at 435-36 (passenger lacked standing to challenge constitutionality of vehicle search because passenger did not claim any ownership or possessory interest in vehicle). It is a longstanding rule that

3

remedies for violations of constitutional rights are only afforded to the individual who "belongs to the class for whose sake the constitutional protection is given." *Hatch v. Reardon*, 204 U.S. 152, 160, 27 S. Ct. 188, 51 L. Ed. 415 (1907). Thus, an individual seeking to challenge the legality of a search as the basis for suppressing evidence must establish that he or she was the victim of a violation of his or her constitutional rights. *United States v. Salvucci*, 448 U.S. 83, 86-87, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980).

A passenger of a vehicle has standing when the initial stop of the car and seizure of both passengers was illegal. See *State v. Epperson*, 237 Kan. 707, 718, 703 P.2d 761 (1985). With regard to constitutionality, a defendant has standing to challenge the constitutionality of a statute only insofar as that statute was unconstitutionally applied to him or her. See *State v. Snow*, 282 Kan. 323, 343, 144 P.3d 729 (2006), *disapproved on other grounds by State v. Guder*, 293 Kan. 763, 267 P.3d 751 (2012); *State v. Thompson*, 237 Kan. 562, 563, 701 P.2d 694 (1985). In other words, a defendant cannot challenge the constitutionality of a statute if the statute was not applied in the defendant's case. *State v. Jacobs*, 293 Kan. 465, Syl. ¶ 2, 263 P.3d 790 (2011).

Possemato was not the driver of the vehicle. But the stop of the vehicle in which he was traveling, the detention of his brother, and the search of the vehicle led to the discovery of marijuana, which was the evidence that provided the basis for Possemato's arrest. Thus, Possemato has standing to challenge the constitutionality of the statute justifying the traffic stop.

B. *Unconstitutionally vague*

Having determined Possemato has standing to challenge the statute as unconstitutional, we now move to the merits of Possemato's claim that K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague as applied to him. Possemato challenged the

constitutionality of this statute (as applied to him) before the district court below, so the issue is properly preserved for appeal.

If the statute is unconstitutionally vague as applied to him, then law enforcement would not have had the requisite reasonable suspicion to have conducted the traffic stop and any evidence discovered as a result of that stop would have to be suppressed. The question of whether a statute is constitutional presents a question of law subject to unlimited review. *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015), *cert. denied* 136 S. Ct. 858 (2016). In reviewing a statute, the appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's apparent intent. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016).

To determine whether a criminal statute is unconstitutionally vague, the appellate courts employ a two-part test. First, the court assesses whether the statute gives adequate warning of the proscribed conduct. This part of the void for vagueness test is based on the due process requirement that a statute's language must convey a sufficient warning of the conduct proscribed when measured by common understanding and practice. *State v. Adams*, 254 Kan. 436, 438, 866 P.2d 1017 (1994). A statute is unconstitutionally vague if it fails to "'provide a person of ordinary intelligence fair notice of what is prohibited.'" *Bollinger*, 302 Kan. at 318.

In the second step, the court determines whether the statute provided clear standards to those who apply them so as to prevent arbitrary and discriminatory enforcement. 302 Kan. at 318. A vague law impermissibly delegates basic policy matters to police officers, judges, and juries for resolution on a subjective basis, with the dangers of arbitrary and discriminatory application. See *City of Wichita v. Hackett*, 275 Kan. 848, 854, 69 P.3d 621 (2003). Under this second step of the test, a statute will be found

unconstitutionally vague if it "'forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Adams*, 254 Kan. at 439 (quoting *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983]). A statute is not unconstitutionally vague if its words are commonly used or judicially defined, or have a settled meaning in law. *City of Wichita*, 275 Kan. at 853-54.

Under the Fourth Amendment to the United States Constitution, the stop of a vehicle being driven always constitutes a seizure. *Thompson*, 284 Kan. at 773; see *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). In order to make such a stop, an officer must have articulable facts sufficient to constitute reasonable suspicion for the stop under K.S.A. 22-2402 and *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A traffic infraction provides an objectively valid reason to effectuate a traffic stop. *City of Norton v. Wonderly*, 38 Kan. App. 2d 797, 802-03, 172 P.3d 1205 (2007).

According to Deputy Stopper's testimony, Possemato's vehicle was traveling in the left-hand lane and not passing any other vehicles, nor was it allowing other vehicles to merge on the highway. K.S.A. 2016 Supp. 8-1522 provides:

> "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.
> "(a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
> "(b) Upon a roadway which is divided into three lanes and provides for two-way movement of traffic, a vehicle shall not be driven in the center lane except when overtaking and passing another vehicle traveling in the same direction when such center lane is clear of traffic within a safe distance, or in preparation for making a left turn or where such center lane is at the time allocated exclusively to traffic moving in the same

6

direction that the vehicle is proceeding and such allocation is designated by official traffic-control devices.

"(c) Upon a highway located outside the corporate limits of any city divided into two lanes of traffic proceeding in the same direction, all vehicles shall be driven in the right lane except when:

(1) Overtaking and passing another vehicle;

(2) preparing to make a proper left turn;

(3) otherwise directed by official traffic-control devices; or

(4) otherwise required by other provisions of law.

"(d) Upon a highway located outside the corporate limits of any city divided into three or more lanes of traffic proceeding in the same direction, vehicles shall not be driven in the far left lane except when:

(1) Overtaking and passing another vehicle;

(2) preparing to make a proper left turn;

(3) otherwise directed by official traffic-control devices; or

(4) otherwise required by other provisions of law."

The video of the traffic stop clearly shows Possemato's vehicle was being driven in the left lane. Although Deputy Stopper testified that the vehicle had been traveling in the left lane for about three miles prior to the traffic stop, only the first mile—before reaching the city limits of Junction City—is relevant to our analysis because the statute does not apply within the city limits of Junction City. Thus, we must decide whether the statute is unconstitutionally vague as applied to Possemato based solely on Deputy Stopper's testimony and not on the evidence in the video because the video does not begin until right before the car is stopped within the limits of Junction City.

Possemato claims that the language "[o]vertaking and passing another vehicle" as set forth in K.S.A. 2016 Supp. 8-1522(c) is vague as applied to him. In support of his claim, Possemato relies on *State v. Reese*, 42 Kan. App. 2d 388, 390, 212 P.3d 260 (2009), for the legal proposition that criminal statutes should be narrowly construed, which in this case would require the court to define "overtake" as it is commonly used,

which is "to catch up with." Possemato also relies on Deputy Stopper's testimony, in which the deputy states that there is no standard as to how far before attempting to pass another vehicle a vehicle can pull out into the left lane, to support his claim that the statute is vague. In sum, Possemato complains the statute is unconstitutionally vague because there is no objective standard within the statute for defining the word "overtake" and there is no objective criteria for individual officers to use in deciding when one vehicle begins to overtake another vehicle.

Although no Kansas court has considered whether K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague, federal courts have rejected a similar claim arguing that K.S.A. 2016 Supp. 8-1522(c) is void for vagueness. In *United States v. Alvarado*, Nos. 14-10050-01, 14-10050-02-JTM, 2014 WL 2711910 (D. Kan. 2014) (unpublished opinion), the court found that

> "Subsection (c) is far *less* vague than Subsection (a)'s requirement of maintaining a single lane of traffic if 'practical,' yet that provision has repeatedly been applied by both federal and Kansas state courts without any suggestion that it is impermissibly vague. Similarly, Subsection (c) is also far more definite than the Oklahoma statute prohibiting 'imped[ing] the normal flow of traffic,' which the Tenth Circuit has explicitly upheld against a vagueness challenge. *United States v. Borrego*, 66 [Fed.] Appx. 797, 800 (10th Cir. 2003)." *Alvarado*, 2014 WL 2711910, at *2.

The *Alvarado* court concluded that "[t]he statute prohibiting travel in the inside lane unless '[o]vertaking or passing' another vehicle is readily understandable by persons of ordinary intelligence." 2014 WL 2711910, at *3.

In *Baker v. State*, 50 S.W.3d 143 (Tex. App. 2001), the defendants challenged the constitutionality of a statute requiring that vehicles stay in the right lane, except when passing, in certain posted areas. The Texas Court of Appeals rejected the void for vagueness argument regarding a similar statute. The court stated:

8

"[P]eople of ordinary intelligence would know from reading the sign that the left lane was for passing only. Furthermore, such persons would not have to guess as to whether they were passing another vehicle. It is obvious from the sign that, if a person is not in the process of passing another vehicle, the person is not to be in the left lane. We think that a person of ordinary intelligence would know when the person is no longer passing a vehicle and must move from the left lane. [Citation omitted.]" 50 S.W.3d at 146.

In Kansas, K.S.A. 2016 Supp. 8-1522(c) provides that all vehicles shall be driven in the right lane except when "[o]vertaking and passing another vehicle." Although this may not have the exact meaning to all drivers, it effectively communicates that a driver should drive in the right lane except when he or she is in the process of overtaking and passing another vehicle. Here, the State persuasively argues that a person of common intelligence is adequately notified of the prohibited conduct under the language used in K.S.A. 2016 Supp. 8-1522(c).

Based on the discussion above, we find K.S.A. 2016 Supp. 8-1522(c) reasonably describes conduct that a person of common intelligence would understand is prohibited and does not contain terms that are confusing or susceptible to ambiguous or differing meaning. As such, Possemato has failed to demonstrate that K.S.A. 2016 Supp. 8-1522(c) is unconstitutionally vague as applied to him.

II. *Motion to suppress*

An appellate court uses a bifurcated standard when reviewing a district court's decision on a motion to suppress. The factual underpinnings of the suppression decision are reviewed under a substantial competent evidence standard, and the ultimate legal conclusion drawn from those facts is reviewed de novo. An appellate court does not reweigh evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). The State bears the burden to prove the lawfulness of the search and seizure. *State v. Overman*, 301 Kan. 704, 710, 348 P.3d 516 (2015).

After an evidentiary hearing on Possemato's motion to suppress, the district court determined that law enforcement had reasonable suspicion to believe that the driver of the vehicle was committing a traffic violation and the car stop was not unlawfully extended to facilitate a dog sniff. Based on the drug dog alert and Sean's subsequent confession, the district court concluded there was probable cause to conduct a search of the car.

On appeal, Possemato claims the district court should have granted his motion to suppress Sean's statements to law enforcement and to suppress the marijuana discovered in the trunk of the car as both pieces of evidence were fruit of the poisonous tree. Specifically, Possemato argues Deputy Stopper did not have reasonable suspicion to conduct a traffic stop; thus, the subsequent dog sniff and Sean's statements to law enforcement must be suppressed. Even assuming there was reasonable suspicion to initially detain the occupants of the vehicle, Possemato argues in the alternative that the dog sniff and Sean's statements to law enforcement occurred only after Deputy Stopper unlawfully prolonged Sean's detention beyond the time needed to conduct the traffic stop; thus, again, the dog sniff and Sean's statements to law enforcement must be suppressed. We address each of Possemato's arguments in turn.

A. *Reasonable suspicion*

Possemato challenged the initial stop of the vehicle. He asserted the vehicle was in the process of legally overtaking another vehicle in the passing lane, in compliance with K.S.A. 2016 Supp. 8-1522. Because there was no legal basis for the stop, Possemato argues Sean's statements and the drugs discovered in the trunk of the car must be suppressed as fruit of the poisonous tree.

The district court disagreed with Possemato, finding the video showed Sean was lingering in the left lane in violation of K.S.A. 2016 Supp. 8-1522(c), so the officer had

reasonable suspicion justifying the traffic stop. Deputy Stopper testified that the car was traveling in the left-hand lane of the highway, but the driver was not in the process of passing another vehicle or avoiding an obstruction in the roadway. A traffic violation, even if pretextual, provides an objectively valid reason to effect a traffic stop. We find substantial competence evidence supports the district court's factual findings and affirm the court's legal conclusion that the officer had reasonable suspicion to justify the traffic stop.

B. *Prolonged detention*

Generally, once an officer has determined that the driver has a valid license and is authorized to drive the vehicle, the driver should be allowed to leave without further delay. *State v. Coleman*, 292 Kan. 813, 816, 257 P.3d 320 (2011). A law enforcement officer is permitted, however, to make inquiries and to take action unrelated to the purpose of the initial stop as long as the additional inquiries do not measurably extend or prolong the stop. If an officer's additional inquiries or actions measurably extend or prolong the traffic stop beyond its initial purpose, the officer must have an objectively reasonable and articulable suspicion that criminal activity had taken place or was taking place. 292 Kan. at 816-17.

The United States Supreme Court has held that the Fourth Amendment does not require reasonable, articulable suspicion to justify using a drug dog to sniff a vehicle after a lawful traffic stop. *Illinois v. Caballes*, 543 U.S. 405, 407-09, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). However, the traffic stop may become unlawful if it is prolonged beyond the time reasonably required to complete the initial reason for the stop. 543 U.S. at 407. An officer must not arbitrarily detain an individual in order to procure a drug dog. *Coleman*, 292 Kan. at 823. The permissible length of a traffic stop is determined by the reason for the stop and the circumstances surrounding the stop rather than by a specific time limit. See *State v. Mitchell*, 265 Kan. 238, 241-45, 960 P.2d 200 (1998). In resolving

11

this issue, the court must determine whether the totality of the circumstances justified the prolonged detention. *State v. Walker*, 292 Kan. 1, 8-9, 251 P.3d 618 (2011).

In his motion to suppress, Possemato acknowledged that, when viewed in isolation, a drug dog sniff conducted outside of a vehicle does not constitute a search under the Fourth Amendment that can be challenged. But Possemato claimed the court cannot look at the dog sniff in isolation here because the dog sniff occurred after the purpose of the traffic stop had been effectuated. Possemato claimed that when the totality of the circumstances are considered, this particular search violated his right to be free from unreasonable searches and seizures under the Fourth Amendment. The district court was not persuaded by Possemato's argument. After reviewing the video of the traffic stop, the district court found the dog sniff began before the traffic stop was over, and there was no unusual delay in the stop or the records check.

A review of the video confirms the district court's factual findings. For purposes of clarity, we have created a brief chronology of the stop based on our review of the video:

**0:00**  Deputy Stopper activated his patrol lights directing Sean to pull the vehicle over.

**1:25**  Deputy Stopper's patrol car and Sean's car parked on the shoulder of the highway.

**1:45**  Deputy Stopper told Sean, the driver, the reason for the stop.

- Sean told Deputy Stopper that he was not from here, which Deputy Stopper understood to mean that Sean was not familiar with the Kansas law.
- Deputy Stopper asked Sean where he was going. Sean said Boston.
- Deputy Stopper asked for Sean's driver's license, registration, and insurance card. Upon review of the vehicle registration, Deputy Stopper noticed the car was a rental.

**2:33**  Deputy Stopper asked for a copy of the rental agreement. Sean complied.

- Deputy Stopper asked Sean to get out of the rental vehicle and accompany him to the patrol car. Possemato remained inside the rental car.

12

- Deputy Stopper told Sean that if everything checked out, Sean would receive only an oral warning for the traffic violation.

**3:20** Deputy Stopper and Sean entered the patrol car together.

- Deputy Stopper asked Sean where he was coming from. Sean said Denver.
- Deputy Stopper talked to Sean about his travel plans and what he did for a living. The video confirmed that Sean voluntarily engaged in this conversation and, in fact, was very chatty.

**5:27** Deputy Stopper submitted Sean's driver's license information to the dispatcher.

**6:02** Deputy Stopper requested a canine unit report to the scene.

**9:16** Dispatch told Deputy Stopper that Sean's driver's license was not in the database.

**9:20** Deputy Stopper asked dispatch to check it again.

**9:50** K-9 Officer Christopher Ricard arrived at the scene.

**10:05** Dispatch told Deputy Stopper it found a record of Sean's license in Massachusetts.

**10:24** Officer Ricard took his drug dog around the car to sniff for narcotics.

**12:31** Officer Ricard reported to Deputy Stopper that the dog alerted for narcotics.

**12:40** Deputy Stopper told Sean that the dog alerted to drugs; Sean initially denied it.

**14:18** Sean admitted to having 19 pounds of drugs in the trunk of the car.

**17:41** Officers found large quantities of marijuana in vacuum-sealed bags in the trunk.

In sum, the video confirms that K-9 Officer Ricard and his dog arrived on the scene just prior to the confirmation of the driver's license, and Sean's driver's license was confirmed almost simultaneously with the deployment of the dog for a sniff around the car. Based on the facts in the record as set forth above, we find substantial competent evidence supports the district court's finding that the dog sniff began before the traffic stop was completed. The permissible length of a traffic stop is determined by the reason for the stop and the circumstances surrounding the stop rather than by a specific time limit. See *Mitchell*, 265 Kan. at 241-45. In this case, there is no indication that Deputy Stopper waiting to hear back from dispatch was a staged act to cause undue delay or extend the detention of the traffic stop. About 10 minutes into the video, the drug dog

began the drug sniff. The confirmation of the driver's license came back almost simultaneously to the dog's sniff of the car, so Sean and Possemato were not delayed beyond the purpose of the stop. See *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015) (once purpose of stop concludes, persons could not be detained beyond purpose of stop). The dog sniff did not take long, and it probably would have concluded in the time that it would have taken Sean to exit the officer's vehicle and return to the rental vehicle. From the time the vehicle was stopped to the time that Ricard indicated that the dog alerted, approximately 11 minutes lapsed.

The district court concluded that the canine sniff began before the completion of the traffic stop and that there was no unusual delay in the stop or any indication that Deputy Stopper was attempting to extend the stop to allow time for the K-9 unit to arrive. We find substantial competent evidence supports the district court's factual findings in this regard. We further find these factual findings support the district court's legal conclusion that Sean and Possemato were not delayed beyond the records check for purposes of allowing the drug dog to walk the perimeter of the car to detect the odor of narcotics. As such, the district court did not err in denying the motion to suppress for this reason.

C. *Drug dog alert*

Possemato claims there was insufficient evidence presented at the suppression hearing from which the court could conclude that the drug dog alerted to the presence of narcotics in the vehicle. Without the dog's alert, Possemato argues Sean never would have made his statement regarding the presence of drugs in the trunk of his car. Without a dog alert and Sean's statement, the officers would not have had probable cause to search the vehicle.

At the suppression hearing, Officer Ricard testified that his dog, Scooby, was trained in narcotics detection. Officer Ricard also described his own specialized training as a K-9 handler. Officer Ricard had been a K-9 handler for a year and a half. Scooby was trained to alert to the presence of methamphetamine, heroin, cocaine, and marijuana. He was certified just over three weeks prior to the traffic stop.

After arriving on the scene, Officer Ricard made contact with Possemato, explained what he was doing, and asked him not to antagonize the dog while he was working. Officer Ricard stated that while conducting a sweep of the car, Scooby exhibited "alert behavior, which is intense sniffing and frantic behavior, around the seam of the rear of the vehicle." Officer Ricard testified:

> "[W]hen I got back to the corner, after working around the first time counter clockwise, my dog would go out towards the ditch, observing that aler—or, displaying that alert behavior, and then would come back to the vehicle. He did that several times. He also tried to go underneath the vehicle, which is uncommon for him, when just doing a sniff around a vehicle."

Officer Ricard said that he understood the change in behavior to mean that Scooby alerted to the presence of narcotics. Officer Ricard stated that Scooby was a "passive-alert" dog, which meant that he would sit or lie down when he found the source of the narcotics. Officer Ricard explained that an indication is the "final response, when he believes he's located the source of the odor." Officer Ricard testified that Scooby had never given a false positive in training. Officer Ricard said that Scooby alerted by showing "intense sniffing and frantic behavior." Officer Ricard testified, "It's a different sniffing than him actually sniffing." Officer Ricard said that Scooby alerted on the car and detected the odor of narcotics, but Scooby never indicated with the final response to show that he had found the source of the odor.

15

Officer Ricard informed Deputy Stopper that the dog had alerted to the odor of narcotics coming from the rental car. Deputy Stopper told Sean of the drug dog's alert. At first, Sean denied possessing any drugs, but he soon admitted to having 19 pounds in the trunk of the car. The car was searched, and the marijuana was located in the trunk.

Possemato called an expert witness, Andre Falco-Jimenez, to testify at the suppression hearing regarding the dog sweep conducted by Officer Ricard and Scooby. Falco-Jimenez was a police officer for 24 years, handling dogs for 20 of those years. After his career as a police officer, Falco-Jimenez started a business training dogs for patrol work and for the detection of various things, including narcotics. In his career, he trained "[a] few thousand" dogs, 75% of which went to law enforcement. The court found Falco-Jimenez to be qualified as an expert.

Falco-Jimenez testified that he watched the car stop video that had been played at the suppression hearing. Falco-Jimenez saw Scooby, a Belgian Malinois, exhibit a high intensity from the moment the dog entered the frame of the video. Falco-Jimenez testified that Scooby maintained the high energy during the course of the search, and he believed Officer Ricard was controlling the dog's movements to attempt to get the dog to focus. Falco-Jimenz believed that Officer Ricard was working too hard to try to get Scooby to stay where he wanted him to be, and he was influencing the dog. Falco-Jimenez believed that Scooby was distracted from his task due to the overhandling by Officer Ricard. Falco-Jimenez explained this was a problem with drug dogs because if a handler is spending too much time on specific spots, the dog will begin to believe that is where the handler wants it to be. He said the dog should search independently.

Falco-Jimenz testified that he never saw Scooby make any indication of an alert on narcotics. Falco-Jimenez admitted that he was unable to see Scooby and observe his behavior on the video during the entire search because there were times that Scooby was blocked by Officer Ricard.

16

In support of suppression, Possemato places emphasis on his expert's testimony that Scooby did not alert to the presence of narcotics and was being influenced by his handler. In contrast, Officer Ricard testified that Scooby alerted to the presence of narcotics by exhibiting "alert behavior, which is intense sniffing and frantic behavior, around the seam of the rear of the vehicle." That Officer Ricard testified Scooby alerted but did not give a final indication about the precise location of the drugs is of no legal consequence. See *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (upholding an alert as establishing probable cause to search, finding no need for final indication as to exact location of drugs).

The district court's findings regarding the credibility of these two witnesses do not appear to be included in the record on appeal. The journal entry merely indicates that the K-9 search was valid. The November 3, 2014 hearing—at which the district court orally issued its ruling—is not included in the record on appeal either. But the party claiming that an error occurred has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the district court was proper. See *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015). The district court heard the testimony during the motion to suppress and independently reviewed the videotape of the drug dog sniff. This court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). We find substantial competent evidence supports the district court's conclusion that the dog alerted and that this fact, combined with Sean's confession, establishes probable cause to conduct a search of the car.

III. *Conspiracy*

Possemato challenges the sufficiency of the evidence of his conviction for conspiracy to possess marijuana with the intent to distribute. When a defendant challenges the sufficiency of the evidence in a criminal case, an appellate court reviews

17

the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Belt*, 305 Kan. 381, 397, 381 P.3d 473 (2016). This court does not reweigh the evidence or assess the credibility of witnesses. *Daws*, 303 Kan. at 789.

To convict, the jury was instructed in this case that the State was required to prove, beyond a reasonable doubt, that

"1. The defendant agreed with Sean Possemato to commit or assist in the commission of possession of marijuana with the intent to distribute.
"2. The defendant did so agree with the intent that possession of marijuana with the intent to distribute be committed.
"3. The defendant or any party to the agreement acted in furtherance of the agreement by transporting approximately 19 pounds of marijuana.
"4. This act occurred on or about the 27th day of October, 2013, in Geary County, Kansas."

As noted in the instruction, an agreement is an essential element to the crime of conspiracy, and the jury was instructed that it had to find that Possemato agreed with Sean to commit or assist in the commission of possessing marijuana with the intent to distribute in order to find him guilty. See K.S.A. 2016 Supp. 21-5302(a) (State must show defendant entered into agreement with another person to commit crime or assist in committing the crime); *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 (2010).

"To establish a conspiracy agreement, the State must prove that the conspirators had a mutual understanding, a meeting of the minds, or a common purpose. Conspiracy may not be established by mere association or knowledge of the acts of the other parties; there must be some intentional participation in the conspiracy. Nevertheless, conspiracy is generally established by inference, drawn from acts done in pursuit of an apparently criminal purpose. [Citations omitted.]" *State v. McHone*, No. 93,493, 2006 WL 163455, at *7 (Kan. App. 2006) (unpublished opinion).

18

The existence of an agreement does not need to be proved directly. Rather, "'it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances.'" *Northcutt*, 290 Kan. at 231-32.

When interviewed, Sean told Deputy Stopper that Possemato did not know anything about the marijuana. Despite Sean's claim, Deputy Stopper arrested Possemato because he believed the brothers had agreed to possess the drugs with the intent to distribute. Deputy Stopper testified that the amount of planning for the trip would have been extensive. Deputy Stopper said Possemato was nervous from the very beginning of the traffic stop, which the deputy found odd given Possemato was merely a passenger in the vehicle and was in no danger of receiving a ticket for a traffic violation. Deputy Stopper noted Possemato's "leg was actually shaking. And I believe that he noticed me notice his leg was shaking, and he placed his hand on it to stop it from shaking." In further support of a conspiracy to possess and distribute marijuana, Deputy Stopper testified that he noticed the strong odor of air freshener coming from the rental vehicle's interior, which he found to be suspicious since the vehicle was only to be rented for a short period of time. Deputy Stopper testified that air-freshening devices are often used to mask the odor of illegal drugs. Deputy Stopper also found it unusual for the brothers to have flown to a location and then rent a car for the return trip, explaining that he believed it would be more expensive to do that than to book a round trip flight. Although Sean explained to Deputy Stopper that he rented the car after an uncle called him on Saturday to invite him to attend a World Series game in St. Louis on Monday, Deputy Stopper noticed on the rental agreement paperwork that Sean had rented the car before the baseball game had been scheduled. During his search of the vehicle, Deputy Stopper also confiscated a Target receipt showing the purchase of a large quantity of Foodsaver vacuum bags—the same type of bags containing the marijuana.

The State has provided circumstantial evidence from which the jury could have inferred that Possemato knew there was marijuana in the trunk of the car, which would support the crime of possession. But the State has not provided any circumstantial evidence from which the jury could have inferred that Possemato and Sean had an agreement to possess marijuana with the intent to distribute it. An agreement requires a meeting of the minds; if there is no meeting of the minds, there is no conspiracy. The State must prove that the conspirators had a mutual understanding or agreement, or the accomplishment of a common purpose. *State v. Smith*, 268 Kan. 222, 228, 993 P.2d 1213 (1999). There is some indirect evidence that Possemato knew about the plan to acquire the marijuana and drive it back to Massachusetts for sale. But there is no evidence from which we can infer Possemato entered into an agreement with Sean to distribute or sell the marijuana once they arrived back in Massachusetts. And there certainly is no direct evidence to show that Possemato intentionally participated in the conspiracy to distribute marijuana. In sum, the evidence, even when viewed in the light most favorable to the State, is not sufficient for a rational fact-finder to find Possemato guilty of conspiracy to possess marijuana with the intent to distribute beyond a reasonable doubt. For this reason, Possemato's conviction for this offense must be reversed and his sentence vacated.

Possemato's conviction for conspiracy to possess marijuana with the intent to distribute is reversed and his sentence is vacated.